UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

CANVASFISH.COM, LLC,

      Plaintiff,

                                    Case No. 1:23-cv-611

v.

                                    Hon. Hala Y. Jarbou

PIXELS.COM, LLC,

      Defendant.

_____/

## OPINION

This is an action for copyright and trademark infringement under federal law and for tort under Michigan law.  Count I alleges trademark counterfeiting and infringement under § 32(1) of the Lanham Act, 15 U.S.C. § 1114(1).  Count II brings a claim for false designation of origin in violation of 15 U.S.C. § 1125(a).  Count III alleges copyright infringement under 17 U.S.C. §§ 106 and 501.  Count IV is a claim for violation of the Michigan common law right to publicity.  Before the Court is Defendant's motion to dismiss the complaint for failure to state a claim.  (ECF No. 12).

## I. BACKGROUND

Derek DeYoung is a Michigan-educated professional artist operating in the Traverse City area.  The primary subject of his work is the sport of fly fishing.  (Compl. ¶ 12, ECF No. 1.)  To that end, the majority of his paintings depict fish, rendered with a unique color pallete and perspective that has made his work popular.  (*Id.*)  Not only does he sell to individual collectors, but he has licensed his work to various sporting equipment manufacturers who have displayed his designs on their products.  (*Id.* ¶ 13.)

In order to protect his trademark rights, DeYoung, through Canvasfish.com, LLC (Canvasfish), which owns the rights to his intellectual property, registered the DEYOUNG word

mark with the United States Patent and Trademark Office ("USPTO").  As of September 22, 2020, the DEYOUNG mark covers "Original works of art, namely paintings," in International Class 016, and "Online retail store featuring artwork, apparel, stickers, phone cases, drinkware, blankets, playing cards, boat wraps, coasters, coolers," in International Class 035.  (*Id*. ¶ 14.)  The DEYOUNG mark is displayed prominently on his website header, and it is included as a watermark on his original paintings signifying to the public that works bearing such marks are authentic.  (*Id*. ¶¶ 15-18.)

In addition to the registered DEYOUNG mark, Canvasfish also owns several United States Copyright Registrations for DeYoung's unique works.  (*Id*. ¶ 19; Exhibit 1, ECF No. 1-1.)

Defendant Pixels.com, LLC (Pixels), is a print-on-demand web service that manufactures and sells products imprinted with third-party designed artwork to consumers.  (*Id*. ¶ 23.)  In addition to the website at Pixels.com, Pixels also operates and maintains the websites at fineartamerica.com and designerprints.com.  (*Id*. ¶ 21.)  Each of these sites performs the same function.  In addition to these online marketplaces, Pixels also has a mobile phone application that has a similar functionality to the websites but that only allows users to purchase art prints.  (*Id*. ¶¶ 22, 25.)

Pixels' services allow third-party creators to upload artwork, photographs, and any other digital images they choose to any of its websites.  Pixels does not police the content that is uploaded.  (*Id*. ¶ 23.)  Once creators have uploaded images, consumers can browse the entire catalog of content and purchase a number of physical products bearing those images which Pixels will then manufacture and ship anywhere in the country.  (*Id*.)  Pixels offers "canvas, wood, and acrylic art prints, greeting cards, phone cases, duvet covers, pillows, shower curtains, and tote bags."  (*Id*. ¶ 24.)  When a consumer has selected an image and a physical product, that image is

sent to a Pixels printing facility where the image is printed onto the product and shipped to the purchaser.  (*Id*. ¶ 27.)  Typically, the images are printed on "low-quality products, often overseas." (*Id*. ¶ 50.)   In addition to the printing and shipping services Pixels provides, it also offers an augmented reality application through its mobile app that allows potential buyers to see what the selected artwork will look like when it is hung on their wall.  (*Id*. ¶ 25.)

"Pixels is actively involved in nearly every aspect of its users' sales."  (*Id*. ¶ 28.)  It maintains the library of art, acts as the payment processor, and manufactures, prints, warehouses, and ships each product sold through its websites and mobile applications.  (*Id*.)

In  June  2021,  Canvasfish  discovered  39  copyrighted  DeYoung  works  bearing  the DEYOUNG mark being offered for sale on one of Pixels' websites.  (*Id*. ¶ 29.)  These images were uploaded by users unaffiliated with Canvasfish.[1]  In order to confirm that Pixels was indeed holding these items out for sale, Canvasfish purchased three prints from the Pixels store FineArtAmerica. (*Id*. ¶ 30.)  These prints were sent to Canvasfish in FineArtAmerica packaging and each of the prints bore the DEYOUNG mark.  (*Id*. ¶¶ 31-32.)

Later that month, Canvasfish identified additional images on FineArtAmerica that bore the DEYOUNG mark.  In all, Canvasfish determined that "eight of the DeYoung Works were being advertised and offered for sale by Pixels[.]" (*Id*. ¶ 34.)  Consumers could have these works shipped as standard prints or imprinted on items such as "phone cases, pouches, stickers, tapestries, puzzles, coffee mugs, beach towels and pillows."  (*Id*.)

After discovering these images, Canvasfish filed a suit in the Northern District of Illinois in  2022  to  stop  the  individual  third-party  users  who  uploaded  the  infringing  images  to

---

[1] Canvasfish is not the only company whose works are uploaded to Pixels by unauthorized third parties.  According to the complaint, world-famous brands like "Carhartt, Disney, and Nintendo are regularly infringed upon by Pixels' websites."  (Compl.  ¶ 55.)

FineArtAmerica from continuing to profit off of DeYoung's work.  (*Id*. ¶¶ 35-37.)  Upon request, the court issued a temporary restraining order and expedited discovery in favor of Canvasfish.  (*Id*. ¶ 38.)  Despite Canvasfish serving a discovery request for information about the infringing uploaders of DeYoung's work, Pixels allegedly "shirk[ed] its responsibility to prohibit the sale and offering for sale of works containing the DeYoung works and DEYOUNG mark," by putting the onus on Canvasfish to provide the information needed to find the infringing content rather than locating it itself.  (*Id*. ¶ 39.)

In the ensuing months, Pixels continued allowing users to upload infringing content to its sites, as Canvasfish discovered on March 31, 2023, when it again visited Pixels' website and found numerous instances of DeYoung artwork uploaded by unsanctioned third parties.  (*Id*. ¶ 42.)  Not only were the images readily findable through the website's search feature, but the Pixels web page contained a description of a collection of infringing content labeled "Derek DeYoung Products," and also provided a shortcut link to "view all Derek DeYoung products."  (*Id*. ¶¶ 42-44.)  Each of these images also prominently displayed the DEYOUNG mark.  (*Id*. ¶ 43.)  In addition to the shortcuts and search capabilities contained within the Pixels website itself, Pixels also included text and "meta tags" to "attract various search engines crawling the Internet looking for websites relevant to consumer searches for authorized products bearing the [DEYOUNG] [m]ark."  (*Id*. ¶ 45.)

Canvasfish brought this suit on June 12, 2023, seeking preliminary and permanent injunctions against Pixels prohibiting it from displaying and offering up for sale DeYoung works and using the DEYOUNG mark.  Canvasfish also seeks actual damages, lost profits, consequential damages, exemplary damages, and statutory damages as well as costs and attorney's fees.

## II. LEGAL STANDARD

A defendant may move to dismiss a complaint pursuant to Federal Rule of Civil Procedure 12(b)(6) where the plaintiff fails "'to give the defendant fair notice of what the . . . claim is and the grounds upon which it rests.'"  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957)).  While a complaint need not contain detailed factual allegations, a plaintiff's allegations must include more than labels and conclusions.  *Id*. at 555; *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) ("Threadbare recitals of elements of a cause of action, supported by mere conclusory statements, do not suffice.").  The Court must determine whether the complaint contains "enough facts to state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570.  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 679.  "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—that the pleader is entitled to relief."  *Id*. (quoting Fed. R. Civ. P. 8(a)(2)).

At this stage, the Court's decision "rests primarily upon the allegations of the complaint[.]" *Barany-Snyder v. Weiner*, 539 F.3d 327, 332 (6th Cir. 2008).  But the Court can also consider "exhibits attached to the complaint, public records, items appearing in the record of the case, and exhibits attached to defendant's motion . . .  so long as they are referred to in the complaint and are central to the claims contained therein, without converting the motion to one for summary judgment." *Gavitt v. Born*, 835 F.3d 623, 640 (6th Cir. 2016).

## III. ANALYSIS

### A. Violations of the Lanham Act

Count I of the complaint asserts trademark counterfeiting and infringement claims under the Lanham Act, 15 U.S.C. § 1114(1).  Defendant moves to dismiss both claims.

### 1. Trademark Infringement

Canvasfish alleges that "Pixels has used spurious designations that are identical to or substantially indistinguishable from the DeYoung [m]ark on goods covered by registrations for the D[EYOUNG] [m]ark."  (Compl. ¶ 65.)  Since those actions "are likely to cause confusion, mistake, or deception as to the origin, sponsorship, or approval of Pixels' products and commercial activities," Canvasfish claims they constitute trademark infringement.  (Compl. ¶ 66.)

A trademark is "any word, name, symbol, or device . . . used by a person . . . to identify and distinguish his or her goods, including a unique product, from those manufactured or sold by others and to indicate the source of the goods, even if that source is unknown."  15 U.S.C. § 1127.  To state a claim for standard trademark infringement (as opposed to counterfeiting discussed below) "a plaintiff must allege facts establishing that: (1) it owns the registered trademark; (2) the defendant used the mark in commerce; and (3) the use was likely to cause confusion."  *Hensley Mfg. v. ProPride, Inc.*, 579 F.3d 603, 609 (6th Cir. 2009) (citing 15 U.S.C. § 1114(1)).  Only the second element, whether the defendant used the mark in commerce, is at issue in Plaintiff's infringement claim.

Violation of the Lanham Act is generally based on strict liability, but not all sellers of trademark infringing products *use* those marks in commerce.  Courts determine the degree to which a seller is a user by placing alleged infringers on a "spectrum."  *See Ohio State Univ. v. Redbubble, Inc.*, 989 F.3d 435, 447 (6th Cir. 2021).  On one end are companies like eBay and Amazon which facilitate sales for independent vendors and are typically not considered "users."  *See, e.g.*, *Tiffany (NJ) Inc. v. eBay Inc.,* 600 F.3d 93, 102, 109 (2d Cir. 2010) (finding that eBay was not liable for trademark infringement when an unaffiliated eBay seller placed infringing goods up for auction on the site); *Multi Time Mach., Inc. v. Amazon.com, Inc.*, 804 F.3d 930, 938-39 (9th Cir. 2015).  On the other end are brick and mortar stores that sell trademark-infringing items directly to

consumers, regardless of whether the stores design or manufacture those items. *Ohio State*, 989 F.3d at 446; *Lorillard Tobacco Co. v. Amouri's Grand Foods, Inc.*, 453 F.3d 377, 381 (6th Cir. 2006). Therefore, courts must determine where a defendant falls along that spectrum to decide whether liability attaches. And just because a seller is an online service does not mean they automatically escape liability. For example, "parties who design and print trademark-infringing goods typically violate the Lanham Act." *Ohio State*, 989 F.3d at 446 (citing *H-D U.S.A., LLC v. SunFrog, LLC*, 311 F. Supp. 3d 1000, 1030 (E.D. Wisc. 2018)).

In *Ohio State*, the Sixth Circuit considered whether a print-on-demand webservice that sold third-party designs of Ohio State University trademark infringing apparel to customers could be liable under the Lanham Act. *Id.* at 440. The district court had granted summary judgment to the defendant because it determined that Redbubble was merely a passive facilitator, akin to eBay or Amazon, that had no hand in the infringing activity. *Id.* at 447. The Court of Appeals reversed that decision. It determined that a service that facilitates sales between third parties is not automatically off the hook because a signifier of Lanham Act liability is the "level of involvement and control" a defendant has "over the creation, manufacture, or sale of offending goods[.]" *Id.* More control weighs in favor of liability. *Id.* at 448 ("[T]he degree of control and involvement exercised by Redbubble over the manufacturing, quality control, and delivery of goods to consumers is relevant to an assessment of whether the offending goods can fairly be tied to Redbubble for the purpose of liability.").

To be sure, the court in *Ohio State* did not find that Redbubble *was* a seller of the offending goods and therefore a user of the trademarks. It only held that the district court had erred by definitively placing Redbubble on the passive facilitator end of the spectrum. *Id.* at 451-52.

7

However, in making that determination, the court suggested one factor in particular is central to determining whether Lanham Act liability may attach to print-on-demand websites.

> Looking at this Circuit's Lanham Act precedent, it seems that one key distinction between a direct seller who "uses" a trademark under the Act and a mere facilitator of sales who does not is the degree to which the party represents itself, rather than a third-party vendor, as the seller, or somehow identifies the goods as its own . . . Here, although the record is sparse, it appears that products ordered on Redbubble's website do not yet exist, come into being only when ordered through Redbubble, and are delivered in Redbubble packaging with Redbubble tags. Under those facts, the district court erred in affirmatively placing Redbubble on the passive end of the liability spectrum.

*Id*. at 448.  Therefore, Lanham Act liability is more likely to apply to a print-on-demand website to the degree it holds itself – and not the third-party designers – out as the creator of the products in question.  If the service controls the printing, manufacturing, and shipping of the products and delivers those products bearing the service's own labels and tags rather than those of the designer, then it is identifying the goods as its own.

Here, Canvasfish alleges that Pixels "is actively involved in nearly every aspect of its users' sales, providing the art, advertising, payment processor, manufacturing, printing, warehousing, and shipping for each product sold through its Websites and Mobile App." (Compl. ¶ 28.)  Indeed, Canvasfish alleges that Pixels has more control over the goods it sells than Redbubble, which the court in *Ohio State* noted "never t[ook] title to any products shown on its website . . . [and] d[id] not . . . manufacture, or handle th[ose] products." *Ohio State*, 989 F.3d at 440.  Much like Redbubble, Pixels also has a hand in advertising infringing work, allowing users to search for DeYoung artwork and providing a link to view "all Derek DeYoung products," despite the fact that many of those products originated from unlicensed third parties.  (Compl. 14-15.)  In addition, the prints that Canvasfish purchased came in a box bearing a "FineArtAmerica" label.  (*See* Compl. 11.)

While Redbubble and Pixels provide similar services, there are gaps in the record that *Ohio State* suggests must be filled to determine whether Pixels is ultimately liable.  For example, Canvasfish does not allege that the prints they ordered came with Pixels tags attached.  Prints are less likely to have tags than apparel or home goods like blankets and pillows, so the Court does not know whether such items would have featured tags bearing FineArtAmerica labels.[2]  The court in *Ohio State* also noted that "Redbubble classifie[d] its goods as "Redbubble products" and made clothes identifiable as "Redbubble garments."  *Ohio State*, 989 F.3d at 448.  Again, there is no record of whether Pixels follows the same practices.  Even with those gaps, viewing the allegations in a light most favorable to Canvasfish, and considering the greater degree of control Pixels exercises over its manufacturing and shipping process than Redbubble, Canvasfish has made a plausible case that Pixels is a "user" of the trademarks on the products it displays on its websites, and Canvasfish has therefore stated a plausible trademark infringement claim.[3]

## 2. Trademark Counterfeiting

In addition to its trademark infringement claim, Canvasfish also brings a trademark counterfeiting claim under the Lanham Act.  The Lanham Act prohibits the "use in commerce of any reproduction, counterfeit, copy, or colorable imitation of a registered mark[.]" 15 U.S.C. § 1114(1)(a).  "To recover on a federal trademark counterfeiting claim, a plaintiff must show that: (1) the defendant infringed a registered trademark in violation of 15 U.S.C. § 1114; and (2) the defendant intentionally used the mark knowing it was counterfeit as the term counterfeit is defined in 15 U.S.C. § 1116."  *Laukus v. Rio Brands, Inc.*, 391 F. App'x 416, 425 (6th Cir. 2010).

---

[2] Canvasfish claims they only purchased prints from Pixels.  (Compl. ¶ 30.)

[3] Defendant's reliance on *Lopez v. Bonanza.com, Inc.*, No. 17 Civ. 8493, 2019 WL 5199431 (S.D.N.Y. Sept. 30, 2019), is unavailing here. As an out-of-circuit unpublished district court case, it has only persuasive value, and its factual findings have no bearing on this proceeding.  Further, *Lopez* was decided before *Ohio State*; therefore, any legal findings that conflict with those made in *Ohio State* are not applicable.

Section 1116 defines a counterfeit as "a counterfeit of a mark that is registered on the principal register in the United States Patent and Trademark Office for such goods or services sold, offered for sale, or distributed and that is in use whether or not the person against whom relief is sought knew such mark was so registered."  15 U.S.C. § 1116(d)(1)(B)(i).  "Elsewhere, the statute provides additional clarification, defining 'counterfeit' as 'a spurious mark which is identical with or substantially indistinguishable from, a registered mark.'"  *Laukus*, 391 F. App'x at 425 (quoting 15 U.S.C. § 1127).

Here, Canvasfish has already made out a plausible claim for trademark infringement, so the first prong of a trademark counterfeiting claim is satisfied.  That leaves the second prong, which can be split into two parts for analysis.  First, did Canvasfish intentionally use a counterfeit DEYOUNG mark knowing that it was counterfeit?  And second, are the goods or services bearing the mark counterfeit as defined in 15 U.S.C. § 1116?  Because it is challenging to answer the first question without knowing the answer to the second, the Court will analyze the latter question first.

### (a) Are the Allegedly Infringing Goods/Services Counterfeits?

Canvasfish states that they have two trademarks registered with the USPTO: (1) the DEYOUNG word mark for original works of art, namely paintings (the "painting mark"); and (2) the DEYOUNG service mark for the following services: online retail store featuring artwork, apparel, stickers, phone cases, drinkware, blankets, playing cards, boat wraps, coasters, coolers (the "service mark").  (Compl. 4.)  Pixels does not dispute that Canvasfish has registered marks in these categories but argues that it cannot be liable for counterfeiting because it does not use the DEYOUNG mark to sell original works, namely paintings, or as the name of an online retail store.  (*See* Def.'s Br. 15, ECF No. 13.)  Under Pixels' interpretation of trademark counterfeiting, a claim is only actionable against "(1) a spurious mark that is *identical* to a registered mark and (2) only

in relation to the goods and services specifically covered by the registration."  (*Id.* (emphasis added).)

Canvasfish argues that this interpretation is too narrow.  First, it claims the DEYOUNG painting mark covers reproductions of DeYoung paintings and not just original works of art. Second, they argue that Pixels' use of the DEYOUNG mark in connection with their own website constitutes counterfeiting the online retail store itself.  (*See* Pl.'s Resp. Br. 21-22, ECF No. 15.)

In support of its argument that it is not liable for counterfeiting because it offers different goods and services than those protected by Canvasfish's registered marks, Pixels relies on *Timber Products Inspection, Inc. v. Coastal Container Corp.,* 827 F. Supp. 2d 819 (W.D. Mich. 2011). In *Timber Products*, a company that owned a registered mark in connection with lumber products and inspection services sued a company that copied its packaging to ship automotive parts.  *Id.* at 821-22, 830.  The court found that these actions did not constitute counterfeiting because there was "no evidence that Defendant was improperly using Plaintiff's mark to imply that the boxes contained material that was required to be heat treated and that such had been accomplished pursuant to Timber Products' standards."  *Id.* at 830.  In other words, because Timber Products registered its mark in connection with building materials and grading services, the defendant's use of Timber Products' packaging to ship goods that had nothing to do with those goods or services did not constitute counterfeiting because no customer who contracted with Coastal Container to ship automotive parts would think they were getting genuine Timber Products-inspected lumber or building materials.  Pixels argues that, like Coastal Container, it was not in the business of selling products or providing services identical to those contained in Canvasfish's trademark registration, and therefore, it is not liable for counterfeiting.

Canvasfish, on the other hand, first relies on *H-D U.S.A.*, 311 F. Supp. 3d at 1000.[4]  In that case, the court declined to adopt defendant SunFrog's argument that knockoff third party-designed Harley-Davidson t-shirts were not counterfeits because they were obviously of a lesser quality.  *See id*. at 1027-28.  The court held for the plaintiff, noting that the "pertinent question is whether the marks, not the goods, are substantially identical."  *Id*. at 1027.  Further, "although the products themselves are part of the comparison, the central focus is on the appearance of the marks in the context of the products."  *Id*. at 1028.  Canvasfish relies on *H-D USA* to argue that Pixels cannot hide behind the defense that the goods they sold or services they provided were not counterfeit because they are of lesser or different quality from the goods and services contemplated in Canvasfish's painting mark.  In other words, Canvasfish sees Pixels' argument that the painting mark does not cover reproductions as an argument that the reproductions Pixels offers are different because they are lower quality copies, a position it argue contradicts the purpose of counterfeit law because a counterfeit item is by definition a copy.

Canvasfish also cites several district court cases that suggest courts in this circuit interpret the protections provided by registrations broadly in the context of counterfeit law.  *See Ford Motor Co. v. Autel US Inc.*, No 14-13760, 2016 WL 3569541, at *4-5 (E.D. Mich. July 1, 2016) (holding that Ford alleged a plausible counterfeiting claim despite the fact that the defendant did not offer the exact same services); *Music City Metals Co., Inc. v. Jingchang Cai*, No 3:17-cv-766, 2017 WL 4641866, at *7 (M.D. Tenn. Oct. 17, 2017) (permitting a counterfeiting claim where the "goods allegedly sold by the defendants" were "the precise type of goods at issue in [plaintiff's] registration" even though the registration was for a service rather than a good).

---

[4] Canvasfish relies on this case to support liability under their first trademark designation for "original works of art, namely paintings."  Pixels relies on *Timber Products* to show they are not liable for counterfeiting under either of Canvasfish's two designations.

Finally, there is *Laukus*, 391 F. App'x.  In *Laukus*, a company that sold flags and installed flag poles under the name "American Pride" registered "American Pride" as a mark for "retail store services in the field of flags, flag poles, pennants and streamers[.]"  *Id.* at 417-18.  Though the company did not register a separate mark for the flags and flag-related goods actually sold in the store, it did use its mark on such items.  American Pride's owner brought suit alleging counterfeiting against another company that sold flags and flag-related goods under the same name.  *Id.* at 418.  The defendant argued that they were not infringing American Pride's mark because the registration did not explicitly cover goods bearing the American Pride mark; instead the mark covered retail store services.  *Id.*  The court in *Laukus* concluded that "[f]or the purposes of a counterfeiting claim, the statute in no way distinguishes registered marks for services from registered marks for goods."  *Id.* at 425.  It held that Laukus made out a prima facie counterfeiting claim because "defendants used Laukus's protected service mark – which mark he registered for 'retail store services in the field of flag, flag poles, pennants, and streamers' – in connection with the sale of its flag products[.]"  *Id.*

### i.   The DEYOUNG Service Mark

Reading these cases together, the Court concludes that Canvasfish presents a plausible case that the goods Pixels sold bearing the DEYOUNG mark were counterfeits.  True, Pixels does not operate a DeYoung online retail store, nor does it offer original paintings.  However, it does sell, manufacture, and print the same *type* of goods that are directly covered by Canvasfish's registered service mark.

Recall, the central touchstone of trademark analysis – which applies equally to counterfeiting and run-of-the-mill infringement – is whether defendant's use of a registered mark "is likely to cause confusion, or to cause mistake or to deceive."  15 U.S.C. § 1114(1)(a).  In *Timber Products*, the products were not just different, but of an entirely separate category (automotive

parts instead of lumber).  This is important because, as previously noted, the court pointed out, there was "no evidence that Defendant was improperly using Plaintiff's mark to imply that the boxes contained material that was required to be heat treated and that such had been accomplished pursuant to Timber Products' standards." *Timber Prods.*, 827 F. Supp. 2d at 830.  In other words, Coastal Container was not trading off of Timber Products' goodwill to make sales because no reasonable consumer would believe that the automotive parts they contracted with Coastal Container to ship were Timber Products graded lumber or building materials.  There was no dispute that Coastal Container created an identical copy of Timber Products' shipping container.  What tips mere appropriation or copying into counterfeiting territory is the likelihood that the similar marks will confuse consumers into believing the owner of the original registration sanctions the allegedly infringing goods, not the identical nature of the items bearing those marks.  *See H-D U.S.A.,* 311 F. Supp. 3d at 1028.

Here, the category of products is the same.  Canvasfish has a registered mark for an online store that sells prints, boat wraps, phone cases, drinkware and various other products bearing DeYoung's artwork and registered mark.  Pixels sells the exact same products – prints, phone cases, drinkware, and stickers.  It also sells a similar type of product – various other items bearing DeYoung's artwork and mark including beach towels, pillows, tapestries, puzzles, and pouches. (*See* Compl. ¶ 34.)  When a consumer buys a product off of Pixels' website bearing a DEYOUNG mark, they may well think they are buying an official DeYoung product.  Therefore, Pixels' use of the DEYOUNG mark could cause confusion in the general public over whether the goods are genuine Canvasfish products or knockoffs.  *Laukus* suggests that the fact that the registered mark is for services (as opposed to goods) is not relevant so long as the services offered involve the goods in question.  Therefore, Canvasfish's service mark plausibly protects these goods as well.

In addition, as in *Laukus*, although Canvasfish does not have a registered mark expressly covering all the goods it sells on its online store, it uses the mark in connection with those goods.

As Pixels points out, some authorities appear to advocate for a more narrow interpretation of trademark counterfeiting than the available precedent suggests is applicable in this circuit.  The leading treatise on trademarks, for example, states the following:

> This definition of "counterfeit" [i.e., the definition articulated in § 1116(d)] reaches only cases in which the counterfeit mark is used in connection with the same goods or services as those for which the mark is registered on the Principal Register and is in use. Thus, if the mark REGIS is registered only for pens and pencils, while the trademark owner might well have a civil remedy against the unauthorized use of REGIS on writing paper, such a use is not a "counterfeit." Congress wished to discourage "boilerplate" charges of counterfeiting in ordinary trademark infringement suits and encouraged the assessment of attorney fees for frivolous counterfeiting allegations.

4 McCarthy on Trademarks and Unfair Competition § 25.15 (4th ed. 2011).  However, McCarthy goes on to say that the words "same goods" require that "the accused goods or services must be the same as those for which the plaintiff's mark is registered. While the identity of goods and services requirement is clear and explicit in the criminal counterfeiting statute, it is not so clear in the civil statute."  *Id*.  Therefore, even the stricter interpretation of counterfeiting put forth by McCarthy leaves open the possibility that there are different standards for civil and criminal trademark counterfeiting, meaning that this interpretation is not necessarily at odds with Sixth Circuit precedent.[5]

Therefore, the Court concludes that Canvasfish has plausibly alleged that Pixels sold counterfeit goods.

---

[5] Though McCarthy acknowledges the differences in language between the criminal and civil statute, it argues that "the meaning is the same. Congress intended that, for the purpose of obtaining an ex parte seizure order, a counterfeit mark must be used on the same goods or services as those for which the plaintiff's mark is federally registered." McCarthy on Trademarks and Unfair Competition § 25.15.  It is clear that McCarthy does not believe a broad definition of "same goods" applies, but that does not change the fact that a different definition is possible and has been followed by courts in this circuit.

### ii.  The DEYOUNG Painting Mark

Next, Pixels argues that they are not liable for trademark counterfeiting under Canvasfish's other mark which covers original works of art, namely paintings.  This position is more convincing.  Pixels does not sell paintings, only prints (and various items bearing reproductions of artwork).  Therefore, no reasonable consumer purchasing a print or product displaying DeYoung artwork from Pixels' website would be confused over whether they were purchasing an original DeYoung painting.  Canvasfish argues that, through this line of reasoning, "Defendant attempts to slither out of trademark counterfeiting liability because it sells an infringing reproduction[] [and] [a]ccepting that argument would grant immunity for the very act of counterfeiting."  (Pl.'s Resp. Br. 21, ECF No. 15.)  However, Pixels is not arguing that their prints are not counterfeits because they are of a lesser or different quality; rather, they claim that they do not sell the category of good covered by that specific registration at all.  The Court agrees.

Canvasfish could have registered a mark simply for original works, or artwork, or artistic images, but it chose to register its mark for "paintings," specifically narrowing the scope of its stated protections.  Further, the Court has already determined that the type of goods that Canvasfish argues are protected under the painting mark are already protected under the service mark.  So, interpreting the painting mark as only protecting original paintings is logical to avoid redundancy in the protections offered by the two marks.[6]

### iii.  The DeYoung Online Store

Finally, Pixels states that it is not liable for operating a counterfeit online retail store.  Pixels argues this is so because it "does not operate websites with URLs that use the DEYOUNG mark as a name for an on-line retail store."  (Def.'s Resp. Br. 17.)  The Court is not persuaded by Pixels'

---

[6] This is not to suggest that redundancy in trademark registrations is in any way suspect.  In the Court's opinion, however, it makes sense to interpret two separate registrations to cover different uses of marks.

16

argument at this stage.  Pixels sells many of the same products as those on offer on DeYoung's own online store, and the items offered on Pixels' websites bear the DEYOUNG mark.  Pixels does not cite any authority that supports its position that it can only be liable for operating a counterfeit website if it uses the DEYOUNG mark in its URLs.  Pixels offers a functionality that allows users to "view all Derek DeYoung work" and categorizes third-party uploads as "Derek DeYoung products."   Therefore, Pixels' website, and specifically the portion that advertises DeYoung's works, plausibly uses a counterfeit DEYOUNG mark.

Neither Pixels nor Canvasfish briefed the likelihood of confusion factors necessary to support a counterfeiting claim, so the Court will not analyze them here.  That being said, there is an open question as to whether a consumer visiting the Pixels website would believe that they are actually browsing a DeYoung online store when they are shopping for artwork on Pixels' apps or websites.  The premise of Pixels' service is that it acts as a marketplace for third-party uploaded pictures and artwork, something consumers specifically go to Pixels for.  (*See* Compl. ¶ 23.) Further, the Pixels logo and branding is prominently displayed on the websites in question (on FineArtAmerica, it is FineArtAmerica branding).  (*See* Compl. 18.)   The fact that Pixels offers a functionality that allows users to "view all Derek DeYoung work" or categorizes third-party uploads as "Derek DeYoung products," does not necessarily support counterfeit liability.  These features may make it more obvious to consumers that they are on an independent website because they would be unnecessary on DeYoung's own online store where all of the products are already "Derek DeYoung products."  To the extent that Canvasfish's allegations cover the mobile phone apps that Pixels operates, a user would have to go to the app store, search for, and download the Pixels or FineArtAmerica app before browsing and making a purchase, meaning there are multiple obvious clues as to the source of the service that a consumer would have to miss to believe

DeYoung was responsible.  However, because Pixels has not made these arguments, this claim will survive.

In sum, Canvasfish has made out a plausible claim that the goods Pixels sold on its websites were counterfeits because these goods were in the category covered by the registered DeYoung service mark. Canvasfish has also stated a viable claim that Pixels operated a counterfeit DeYoung online retail store.  On the other hand, the Court finds that Canvasfish's paintings mark does not cover reproductions.

### (b) Did Pixels Intentionally Use the Counterfeit Mark?

The final requirement for a trademark counterfeiting claim is that "the defendant intentionally used the mark knowing it was counterfeit." *Laukus*, 391 F. App'x at 425.  The Sixth Circuit has not substantially outlined the contours of "intentional use."  In many cases, the intentionality of use of a counterfeit mark is not at issue because the "user" is either also the designer of the allegedly infringing product, or the intentionality is simply not in dispute.  Here, Pixels is indisputably not the designer of the allegedly infringing products displayed on its websites.  (Compl. ¶ 23.)  Therefore, Canvasfish must allege that Pixels nevertheless knew artwork bearing counterfeit marks was being uploaded and sold through its websites.

Courts in this circuit and others have equated "intentional use" as it appears in § 1114 with willfulness.  *See, e.g., Louis Vuitton Malletier & Oakley, Inc. v. Veit*, 211 F. Supp. 2d 567, 583 (E.D. Pa. 2002); *Coach, Inc. v. Ocean Points Gifts*, No. 09-4215, 2010 WL 2521444, at *3 (D. N.J. June 14, 2010); *Wheel Specialties, Ltd. v. Starr Wheel Grp, Inc.*, 918 F. Supp. 2d 688, 696 (N.D. Ohio 2013).  This standard allows plaintiffs to show that a mark was intentionally used where the defendant may not have actually known that they were selling a counterfeit product but chose to remain willfully blind to the likelihood they were doing so.  *See Wheel Specialties, Ltd.*, 918 F. Supp. 2d at 696 (holding the issue of intentional use was a fact issue for the jury to decide

18

where the plaintiff claimed that the defendants either had actual knowledge they were selling counterfeit marks or were at least "willfully blind" to the fact).

Here, Canvasfish offers two categories of evidence of Pixels' willful blindness.  First, it argues that the 2022 lawsuit it initiated in Illinois put Pixels on notice that counterfeit DeYoung artwork was being offered for sale on FineArtAmerica, yet Pixels continued to sell counterfeit goods.  (Compl. ¶¶ 40-44.)  Second, Canvasfish points to the overall prevalence of counterfeiting on Pixels' websites, alleging that "Pixels' business model is intended to induce, and collect revenue from, wide-scale copyright and trademark infringement."  (*Id*. ¶ 56.)

In 2022, Canvasfish brought suit in the Northern District of Illinois against third-party sellers of DeYoung products on one of Pixels' websites.  The purpose of the suit "was to unmask purported anonymous sellers on Pixels' Websites and freeze their payment accounts."  (*Id*. ¶ 37.) In the course of the lawsuit, Canvasfish served a discovery request on Pixels informing them of the allegedly infringing activity and asking them to provide information on the infringing accounts. (*Id*. ¶ 39.)   Months later, Canvasfish checked FineArtAmerica again and found that the same infringing activity was still taking place.  (*Id*. ¶ 42.)

In addition to the description of the previous lawsuit, Canvasfish also includes in their complaint screenshots of the FineArtAmerica website showing artwork depicting characters from Star Wars and Nintendo, as well as the Carhartt logo.  (*Id*. 18-19.)  Canvasfish claims these particular products are unsanctioned reproductions of trademarked properties, showing that Pixels turns a blind eye to wide-spread infringement across its platforms, not just of DeYoung's mark.

The Court finds that Canvasfish states a plausible claim that Pixels intentionally sold counterfeit DeYoung products.  It is alleged that Pixels knew that products which infringed Canvasfish's trademarks were being offered for sale by users of its website as early as September

2022.  Even if it took action to remove those particular offending products,[7] it did not stop either those users or others from uploading DeYoung trademarked images.  Indeed, there appears to be a pattern of ignoring the trademarks of the goods offered on its websites, as multiple well-known brands of products are being offered by third-party users for sale, apparently without license.  The Court finds that these allegations are sufficient to show that Pixels plausibly knew or was willfully blind to sales of counterfeit products bearing the DEYOUNG mark on its websites.  Canvasfish has therefore made out a plausible trademark counterfeiting claim.

### B. False Designation of Origin

Canvasfish next asserts a claim for false designation of origin in violation of 15 U.S.C. § 1125(a), which states in relevant part,

> (1) Any person who, on or in connection with any goods or services, or any container for goods, uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which—
>
> (A) is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person, or
>
> (B) in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities,
>
> shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act.

15 U.S.C. § 1125(a)(1).  A "Lanham Act claim for false designation of origin comprises two elements: (1) the false designation must have a substantial economic effect on interstate commerce; and (2) the false designation must create a likelihood of confusion."  *Johnson v. Jones*, 149 F.3d 494, 502 (6th Cir. 1998).

---

[7] Pixels claims it promptly removed those users.  Canvasfish does not allege that those accounts were ever disabled.

Canvasfish alleges that "Pixels has used the DEYOUNG mark in commerce on and in connection with its goods, specifically, its low-quality print on demand canvas, wood, and acrylic art print, greeting cards, phone cases, duvet covers, pillows, shower curtains, and tote bags." (Compl. ¶ 73.)  Further, Canvasfish alleges that "Pixels also falsely designates Plaintiff as the origin or source of the goods[,]" and that those actions are likely to cause confusion.  (*Id*. ¶¶ 73-74.)  Pixels argues that it is not liable under a false designation of origin claim because it is not the user of the infringing mark – the third-party uploaders are.  (Def.'s Br. 15.)

The Court has already concluded that Canvasfish has plausibly alleged that Pixels, through its websites, is a user of Canvasfish's protected marks.  Since Pixels does not advance any other argument as to why Canvasfish's false designation of origin claim should be dismissed, this claim will survive.

### C. Copyright Infringement

Next, Canvasfish alleges that Pixels infringed its copyright by allowing third-party users of its sites to upload and sell exact copies of copyrighted works to consumers.  (Compl. ¶¶ 81-85.) Pixels moves to dismiss this claim arguing that they are immune from copyright liability under the safe harbor provision of the Digital Millenium Copyright Act (DMCA), 17 U.S.C. § 512(c). (Def.'s Br. 18.)

#### 1. DMCA Safe Harbor

The DMCA was enacted in 1998 "both to preserve copyright enforcement on the internet and to provide immunity to service providers from copyright infringement liability for 'passive,' 'automatic' actions in which a service provider's system engages through a technological process initiated by another without the knowledge of the service provider."  *ALS Scan, Inc. v. RemarQ Cmtys., Inc.*, 239 F.3d 619, 625 (4th Cir. 2001) (citing H.R. Conf. Rep. No. 105-796, at 7 (1998); H.R. Rep. No. 105-551(I), at 11 (1998)).  The DMCA provides a "safe harbor" for infringing

material where the service provider (1) does not have actual knowledge that the material or an activity using that material on the system or network is infringing; (2) in the absence of such actual knowledge, is not aware of facts or circumstances from which infringing activity is apparent; or (3) upon obtaining such knowledge or awareness, acts expeditiously to remove, or disable access to, the material; (4) does not receive financial benefit directly attributable to the infringing activity, in a case in which the service provider has the right and ability to control such activity; and (5) upon notification of claimed infringement, responds expeditiously to remove, or disable access to, the material that is claimed to be infringing or to be the subject of infringing activity. 17 U.S.C. § 512(c)(1).

The DMCA safe harbor is an affirmative defense.  *Am. Clothing Express, Inc. v. Cloudflare, Inc.*, No. 2:20-cv-02007, 2021 WL 722730, at *6 (W.D. Tenn. Feb. 24, 2021); *see also Atari Interactive v. Redbubble, Inc.*, 515 F. Supp. 3d 1089, 1113 (N.D. Cal. 2021).  Therefore, in order for Pixels to avail itself of the safe harbor at this stage, the "complaint [must] contain[] facts which satisfy the elements" of § 512(c)(1).  *Estate of Barney v. PNC Bank, Nat'l Ass'n*, 714 F.3d 920, 926 (6th Cir. 2013).  If any one element has not been sufficiently pleaded, then dismissal is not appropriate.  Since the first three elements are connected, the Court will start with those.

*Does Canvasfish allege that Pixels has actual knowledge of the infringement?*  Canvasfish states that Pixels "willfully turns a blind eye" to the infringement occurring on its platform. (Compl. ¶ 54.)  However, Canvasfish never alleges that Pixels had actual knowledge that DeYoung copyright infringing works were being offered for sale on their websites.  Their contention instead is that Pixels intentionally avoided learning about the "wide scale" infringement on its sites to avail itself of DMCA protections and to make a profit.  (Compl. ¶¶ 53-56.)  Therefore, Canvasfish has pleaded this element of the DMCA safe harbor.

*Does Canvasfish allege that Pixels is unaware that infringement is likely taking place on its websites?*   A central theory of Canvasfish's complaint is that Pixels ignores wide-scale infringement on its websites to profit off of copyright and trademark infringing material.  (Compl. ¶ 56.)  Thus, Canvasfish has not pleaded this element.  However, the inquiry does not necessarily end there because Pixels may still be entitled to DMCA protections if it acts quickly to take down offending material.

*Does Canvasfish allege that once Pixels became aware of the likelihood of infringement on its site, it acted "expeditiously" to remove the material?*   Again, Canvasfish does not plead this element; rather, it argues the opposite is true.  Canvasfish alleges that Pixels "shirk[ed] its responsibility" to take actions to police infringement on its site and put the onus on Canvasfish to do the work of pinpointing the location of infringing material.  (Compl. ¶ 39.)  Therefore, Canvasfish has not pleaded at least one of the necessary elements to qualify Pixels for DMCA safe harbor protection.  The inquiry ends here.

In order to supplement the lack of support for this affirmative defense in the complaint, Pixels urges the Court to consider the factual and legal findings from *Sid Avery & Associates, Inc. v. Pixels.com, LLC*, No. CV 18-10232, 2021 WL 6114918 (C.D. Cal. Feb. 24, 2021),[8] as well as the contents of an email exchange between Canvasfish and Pixels' counsel that took place during the 2022 Illinois Lawsuit.  (*See* Def.'s Br. 18-21.)  However, when "resolving a 12(b)(6) motion, a court considers only the complaint, and ordinarily does not consider matters outside the complaint."  *Rondigo, LLC v. Twp. of Richmond*, 641 F.3d 673, 680 (6th Cir. 2011) (citations omitted).  Therefore, the Court will not consider these exhibits for their factual content.  *See S&S Innovations Corp. v. Uusi, LLC*, No. 1:18-cv-1377, 2020 WL 12432326, at *1 (W.D. Mich. Mar.

---

[8] In *Sid Avery*, a California district court found, after a bench trial, that Pixels was entitled to the DMCA safe harbor.

12, 2020) (declining to consider evidence of previous lawsuits and exhibits attached to the motion to dismiss when ruling on whether an affirmative defense applied on a 12(b)(6) motion).

Since the DMCA safe harbor is not apparent from the face of the complaint, dismissal based on that defense is inappropriate.  And since Pixels does not advance any other argument as to why Canvasfish's copyright claims should be dismissed, they will not be.

### D. Michigan Law Right of Publicity Claim

Pixels also moves to dismiss Count IV of the complaint, which asserts a violation of Michigan's common law right to publicity.

The right to publicity is based on the premise that "a celebrity's identity can be valuable in the promotions of products, and the celebrity has an interest that may be protected from the unauthorized commercial exploitation of that identity." *Carson v. Here's Johnny Portable Toilets, Inc.*, 698 F.2d 831, 835 (6th Cir. 1983).[9]  "As such, the common law right of publicity forms a species of property right." *Parks v. LaFace Records*, 329 F.3d 437, 459 (6th Cir. 2003).  "The right to publicity is governed by state law." *Id.*

Michigan's right to publicity is couched in the common law right to privacy, which covers four theories.  *Battaglieri v. Mackinac Ctr. for Pub. Pol'y*, 680 N.W.2d 915, 919 (Mich. Ct. App. 2004).  Relevant here is "[a]ppropriation, for the defendant's advantage, of the plaintiff's name or likeness." *Tobin v. Civil Serv. Comm'n,* 331 N.W.2d 184, 189 (Mich. 1982).  "The invasion of privacy cause of action for appropriation is founded upon 'the interest of the individual in the exclusive use of his own identity, in so far as it is represented by his name or likeness, and in so far as the use may be of benefit to him or others." *Battaglieri*, 680 N.W.2d at 919 (quoting

---

[9] The use of the description "celebrity" and its connotations is incidental to the overall premise of the right to publicity, as will be discussed further later.

Restatement (Second) of Torts § 652C.  This tort is actionable when another party "makes use of the plaintiff's name or likeness for his own purpose and benefit . . . ."  *Id.*  In other words, the right to publicity "protects an individual's pecuniary interest in the commercial exploitation of his or her identity."  *Hauf v. Life Extension Found.*, 547 F. Supp. 2d 771, 778 (W.D. Mich. 2008).  "All that a plaintiff must prove in a right to publicity action is that she has a pecuniary interest in her identity, and that her identity has been commercially exploited by a defendant."  *Parks*, 329 F.3d at 460.

### 1. Does Canvasfish have a Pecuniary Interest in the DeYoung Name?

Pixels argues that Canvasfish's complaint falls short of stating a claim for relief under a right to publicity theory, first, because it has not demonstrated that it has a pecuniary interest in the DeYoung name.  Pixels takes issue both with the "conclusory assertion" that DeYoung "is widely known," and that his name "has pecuniary value."  (Def.'s Br. 22.)

These arguments are unconvincing.  All that Canvasfish must do at this stage is "plead factual content that allows the court to draw the reasonable inference" that Pixels is liable.  *Iqbal*, 556 U.S. at 679.  Fame and celebrity in a general sense are not necessary components of a right to publicity claim.  *See Parks*, 329 F.3d at 460.  Canvasfish alleges that DeYoung is a widely known artist – even if he is only widely known in the fly-fishing community – and that he sells artwork for a living.  (*See* Compl. ¶ 12.)  People looking to buy flyfishing artwork search out DeYoung works because of their unique qualities, and DeYoung sells those works for profit.  Therefore, he has adequately alleged that he has a pecuniary interest in his name.

### 2. Has Canvasfish Adequately Alleged that it Owns the Rights to DeYoung's Name?

Next, Pixels argues that the right to publicity claim should be dismissed because Canvasfish has not provided documentary support to show that it has rights in the DeYoung name.

(Def.'s Br. 22.)  Pixels argues that Canvasfish's "blanket statement" that it controls the rights to DeYoung's intellectual property is a legal conclusion that is "not entitled to the presumption of truth by the Court." (*Id.*)  This argument is misguided because the question of whether or not Canvasfish owns the rights in something is not a legal question, it is a factual one.

The common law right to publicity "forms a species of property right." *Parks*, 329 F.3d at 459.  Since rights in property are assignable in Michigan, *see Brady v. Whitney*, 24 Mich. 154, 155 (Mich. 1871), as long as DeYoung assigned the rights in his name to Canvasfish, it has standing to sue.  In the complaint, Canvasfish claims that DeYoung's name and identity have been assigned to it.  (Compl. ¶¶ 91, 95.)  Since the Court is compelled to accept the validity of the well-pleaded facts contained in the complaint, Canvasfish need not provide additional documentary support to prove it has rights in the DeYoung name.

### 3.   Is Pixels Immune Under § 230 of the Communications Decency Act?

Finally, Pixels argues that even if Canvasfish has standing to sue on this claim, it is immune from liability under the Communications Decency Act (CDA), 47 U.S.C. § 230.  Section 230(c) states in relevant part,

> No provider or user of an interactive computer service shall be treated as the publisher or speaker of any information provided by another information content provider.
>
> No provider or user of an interactive computer service shall be held liable on account of--
>
> (A) any action voluntarily taken in good faith to restrict access to or availability of material that the provider or user considers to be obscene, lewd, lascivious, filthy, excessively violent, harassing, or otherwise objectionable, whether or not such material is constitutionally protected; or
>
> (B) any action taken to enable or make available to information content providers or others the technical means to restrict access to material described in paragraph (1).

47 U.S.C. § 230(c)(1)-(2).  Section 230(f)(2) defines an "interactive computer service" as "any information service, system, or access software provider that provides or enables computer access by multiple users to a computer server, including specifically a service or system that provides access to the Internet and such systems operated or services offered by libraries or educational institutions."

Fundamentally, § 230 of the CDA "immunizes providers of interactive computer services against liability arising from content created by third parties." *Jones v. Dirty World Ent. Recordings, LLC*, 755 F.3d 398, 406 (6th Cir. 2014).  In order to rely on such a defense, Pixels must show that "(1) [it] is an interactive computer service provider, (2) the particular information at issue was provided by another information content provider, and (3) the claim seeks to treat the defendant as a publisher or speaker of that information." *Id.* at 409.  "By contrast, a defendant is not entitled to protection from claims based on the publication of information if the defendant is responsible, in whole or in part, for the creation or development of [the] information." *Id.* (internal quotation marks omitted).  Pixels is only entitled to § 230 immunity if the existence of these elements is apparent from the face of the complaint.  *Nemet v. Chevrolet Ltd. v. Consumeraffairs.com, Inc.*, 564 F. Supp. 2d 544, 550 (E.D. Va. 2008).

The § 230 immunity defense is an awkward fit for this type of claim.  Canvasfish is not suing Pixels for the content on its website; it is suing Pixels for selling unauthorized goods to consumers and thereby profiting off of the DeYoung brand.  The appearance and descriptions of the offending products on Pixels' websites are incidental to the underlying claim.  Pixels does not benefit from simply allowing product descriptions or images of DeYoung's works to be displayed on FineArtAmerica; it benefits from printing and shipping the finished products to consumers and charging them money for that service.  Therefore, it is not clear from the face of the complaint that

27

Canvasfish's claim "seeks to treat the defendant as a publisher or speaker" of the targeted information.  *Jones*, 755 F.3d at 409.

Although this precise issue has not been addressed by the Sixth Circuit, courts in other circuits have come to the same conclusion.  *See Parisi v. Sinclair*, 74 F. Supp. 2d 310, 318 n.3 (D.D.C. 2011) ("Liability for sales of a product do not, in the Court's view, fall under the provenance of the CDA because such claims do not treat the defendants 'as the publisher or speaker' of third-party information."); *Bravado Int'l Grp. Merchandising Servs., Inc. v. Gearlaunch, Inc.*, No. CV 16-8657, 2018 WL 6017035 (C.D. Cal. Feb. 9, 2018) (holding that the defendant fell outside of the ambit of § 230 immunity because they were not publishers or speakers of third-party information, but "manufacturer[ers] and sell[ers] [of] infringing merchandise, the designs for which [were] provided by third parties"); *Atari Interactive, Inc. v. SunFrog, LLC*, No. 18-cv-04949, 2019 WL 3804462 at *2 (N.D. Cal. Aug. 13, 2019).

As a result, at this stage, the Court finds that Pixels is not entitled to § 230 immunity.

## IV. CONCLUSION

For the reasons stated above, Pixels' motion to dismiss Canvasfish's complaint will be granted only as to Canvasfish's counterfeit claims concerning the painting mark.  It will be denied as to all other claims.  The Court will enter an order consistent with this Opinion.


Dated: March 1, 2024                          /s/ Hala Y. Jarbou
                                              HALA Y. JARBOU
                                              CHIEF UNITED STATES DISTRICT JUDGE